Okay, we'll now pick up 19-7049, U.S. v. Barrett. May it please the court, 21 years after an ill-conceived, no-knock, no-announce, military-style raid on Mr. Barrett's home left Trooper David Eels dead and Mr. Barrett seriously wounded, we're back before the court on the issue as to whether or not the district court erred in reversing the magistrate judge's finding that ineffective assistance of counsel in the penalty phase of trial prejudiced Mr. Barrett with respect to cap three, the count upon which he got the death penalty, and there's also a subsidiary issue as to whether or not the interrelationship between the counts should lead to a green man for a new sentencing proceeding on counts one and two as well. After hearing seven days of testimony and viewing dozens of exhibits, U.S. Magistrate Judge Steve Schroeder found that trial counsel in the penalty phase both rendered deficient performance and that that deficient performance was prejudicial to Mr. Barrett. The government, in their objections to the reporting recommendation, concede that trial counsel performed deficiently from a constitutional standpoint, so the issue here is prejudice, and we submit that there's at least one and several substantive issues as to why this court should reverse the district court's finding and reinstate the important recommendation of the magistrate judge. One of the interesting things about this case is Judge Schroeder, the magistrate judge, is first-hand, having done a bunch of budget requests at the trial level, heard numerous motion hearings at the trial level, and for 15 years he was familiar with the case. Judge White, who entered the case after Judge Payne recused himself, had been on the case for a grand total of, I think, 24 days before he issued the opinion and order reversing the magistrate judge. Now, Your Honors, as to the procedural defect that we believe occurred in this case, we think that the district court's reversal of the magistrate on the question of prejudice without holding a new evidentiary hearing or at least remanding it for further fact-finding violates the magistrate's act. We think this is one of the unusual or rare cases that fits within footnote 7 of made by the magistrate judge, which are material to his ultimate findings. It is not enough for the district court, based simply on the cold print of the record, to overturn the magistrate. And here- So what were the credibility issues? The credibility- I'm sorry, Your Honor. The credibility issues, we believe, Your Honor, at least in significant part, were the district court favoring the prosecution's expert testimony over what Mr. Barrett presented. That's one of the credibility determinations. Was it- was the judges favoring one over the other based on the belief that the experts for the defendant were telling that- weren't- were liars? Well, Your Honor, the district court certainly found that the prosecution's experts were more credible, but Judge Schrader, in making his determination, said that he thought our experts were credible, that the evidence put on by the government was not persuasive, and rebutting what we put on, and that there was very little added in terms of aggregate aggravation. Nothing added at the evidentiary hearing in terms of aggravation, but there was a wealth of mitigating evidence related to organic brain damage, mental impairments, and a deprived and dysfunctional and abusive background that would have caused at least one juror to do the calculus differently and come back with a lost sentence instead of a death sentence. So, we believe that there should be a remand at a minimum for a further evidentiary hearing, and I know the government has argued that this issue is not properly before the court at this time, because we did not secure a separate certificate of appealability for this particular Magistrate Act issue, but we disagree strongly with that. The issue here is prejudice. A broad certificate of appealability was granted by Judge White for us to enact his findings or to appeal his findings on prejudice. The mechanism by which Judge White found that there was no prejudice was improperly bypassing an additional evidentiary hearing. So, that is all contained within the broad certificate of appealability we received to appeal the prejudice determination of Judge White. Would your Magistrate's Act case be better if you were talking about fact witnesses that may have taken the overing opinions of the fact witnesses and the magistrate judge was making actual credibility findings? Maybe not just finding that he preferred one opinion over the other with experts, but I mean, don't you think that the remand for a hearing is more appropriate in a case where you're dealing with fact witnesses, where observing the witness testimony on the stand might be more important? Well, I think it would be important also, Your Honor, to observe the experts on the stand because they have to use facts or the facts as they perceive them to come to a certain conclusion as to what they believe about Mr. Barrett. So, I think all of that is intertwined with a factual issue and I know the government wants... So, that could, I mean, that could presumably cut against you too if we sent it back for and said the District Court should have had its own evidentiary hearing if it wanted to flip the magistrate. The District Court could have all these experts take the stand again and then make determinations, presumably, seeing all the witnesses about the credibility of your witnesses and on that record find that they... that he didn't think they added much. That's always possible, Your Honor, but he could also find that, hey, once I actually see and hear these witnesses, I have a different perspective on it and I think Mr. Barrett was prejudiced, contrary to what I found based on the old print of the record. In any event, Your Honor, we don't think that the court necessarily has to reach this issue. It's one of the issues we raised. We think it's clear on the record that the court should reverse the District Court's substantive finding of no prejudice and reinstate the report and recommendation of the magistrate judge that there was indeed prejudice. Mr. Autry, Mr. Autry, moving into that issue, do we owe any deference to findings, factual findings, made by the magistrate judge? I believe you do, Your Honor. And if so, if so, which ones? What do you think are the critical factual findings that the magistrate judge made that we would owe deference? The critical factual findings would be, one, Mr. Barrett suffers from significant organic brain damage. Two, as a result of that, he suffers from dis-executive syndrome, which is relevant as it did on the night in question, and credibility with respect to the diagnoses made by the experts, credibility with respect to family witnesses who testified about Mr. Barrett's background. The district judge did not give the magistrate judge's credibility and factual findings sufficient deference. And that's one of the big problems with what happened in the court below and why we think, at a minimum, the case ought to be remanded. So there was no deference given by the district court because the magistrate judge, over a period of seven days, heard the testimony at firsthand, saw it introduced. He is owed deference for that reason. He's the one who was actually there, not this court and not the district court. So, yes, Your Honor, we think that deference is owed. Substantively, Your Honor, it's clear that the district court's opinion is flawed because, for one, the court overlooked an entire category of mitigating evidence. That would be the evidence of Mr. Barrett's abusive and dysfunctional background, which included emotional abuse, physical abuse, psychological abuse, a chaotic upbringing with parents who are constantly at war with one another, both physically and emotionally, overpunishment by the mother. The mother was an alcoholic who was abusive. We outline all that in our brief. I'm not gonna go over chapter and verse, but this court and the Supreme Court had stated repeatedly that evidence of this nature is mitigating evidence per se, that is among the most powerful types of mitigating evidence that a jury can consider that would lead a jury to reject the death penalty in favor of a sentence less than dead. And when you say this is some of the most powerful evidence, what evidence are you referring to specifically when you say that? Okay, I'm referring, Your Honor, and I wasn't clear enough. I'm saying that this court and the Supreme Court had said evidence of this type. What type? Of a deprived and abusive background. Okay. Uh, is inherently mitigating and that evidence of this type is among the most persuasive types of mitigating evidence and persuading juries not to impose the death penalty. So you had no account taken of any of that. I think all that Judge Watt said was well, there was evidence that Mr Barrett had a less than ideal childhood, but there was no analysis. And importantly, none of the witnesses called by the government could dispute any of this stuff about Mr Barrett's background. I cross examine Dr Pitt at length about all that. He had no reason to disagree with any of it. Dr Price had no reason to disagree with any of it. There was no evidence put on by the government that showed that our evidence of an abusive and dysfunctional background was somehow untrue. So you have basically uncontested, highly persuasive, mitigating evidence that is not sufficiently considered by the district court. Council wasn't some of that evidence presented at the trial at the not no family background evidence at all. The family background evidence that was presented did not touch on abuse or dysfunction or anything else. It was that he's a good guy who comes from a good family, who's a good mechanic and a good friend. It was the typical superficial good guy type of case that generally results in a defendant being sentenced to death. But no, Your Honor, there was no evidence regarding his dysfunctional and abusive background. And Judge Schrader, importantly, addressed an issue that this court raised in its opinion in 2015, namely, well, with this evidence, had it been put on, had been a double edged sword. And Judge Schrader answered that in the negative because the jury was already inundated with evidence about Mr Barrett's drug involvement, his drug use, acts of and things of that nature. And Judge Schrader found, as this court implied in 2015 that there was no downside to introducing that evidence because all these other negatives are already out there. And this evidence could only mitigate could only mitigate an offer of mitigating explanation for Mr Barrett's conduct, of which the jury was already aware through the defense counsel know of this evidence of his deprived and abusive background? No, Your Honor, because they didn't thoroughly or sufficiently investigated. And that's one of the what did they not know about it? What was virtually none of it? But virtually none of it because they only did very superficial interviews of any of the family members they talked to, including at the courthouse right before they went on the stand. So where do we go to the record to find out what the defense counsel knew? You can look at the testimony of Brett Smith and Roger Phil feeder, and I'm sorry I don't have specific page numbers, but certainly Judge Schrader and his report and recommendation talked about this being one of the reasons that counsel was constitutionally deficient in their performance. And as mentioned, in fact, the government concedes that they and you and you examine them. So if I look at that, I'm guessing that's transcript that I'm gonna look at. Yes, Your Honor. You can look at Brett Smith's testimony. You can also look at the direct testimony of Mr Hill figure who's the lead counsel. We chose not to cross examine Mr Hill figure because his direct testimony is found by the magistrate judge was extremely favorable to us. That's why there was no need to cross examine Mr Hill figure. All right, but you did examine Mr Smith. Yes, Mr Chardall, who was co counsel on this case, Tim Chardall examined or cross examined Mr Smith. Okay, great. Thank you. Now, the district court also failed to take into sufficient account and mischaracterized our mental health mitigation evidence is going to competency. There was a competency issue raised in the 22 55 petition that was dealt with and disposed of a long, long time ago. So competency was not the thrust at all of the evidence we were putting on during this hearing. It all went to mitigation of punishment and with respect to organic brain damage, which the evidence suggests Mr Barrett has and this executive syndrome, which the evidence suggests that he has. It is clear that that and Judge Schrader answered a very important question that was posed by this court in 2014 when we had oral arguments and in 2015 when this court issued its opinion because this court said, Hey, all this stuff sounds good about his mental health and the brain damage and all that. But there's this report under seal from Dr Price that still hadn't been unsealed, and it would be easy for the court to conclude that there was no deficient performance, let alone prejudice. If Dr Price, who examined Mr Barrett for the government at the time of trial, found that Mr Barrett was a psychopath or a sociopath, that didn't happen is Judge Schrader stated in his report recommendation. Dr Price did not find that Mr Barrett was a sociopath or a sociopath. The government's expert psychiatrist found that Mr Barrett was not a psychopath or a sociopath, did not suffer from antisocial personality disorder because there was no evidence of conduct disorder, which is a prerequisite for finding an adult with antisocial personality disorder. And let me dispose as quickly as I can of two canards in the district court's opinion about the organic brain damage evidence and the mental health evidence. One, the district court said, Well, all that may be well and good, because keep in mind the government could not refute anything on this significant organic brain damage stuff. Nothing. Dr. Price agreed with it in large part, saying that he has some strengths, but his weaknesses neurologically are very, very, very weak. Dr. Pitt did not conduct a neuropsychological examination in connection with his examination of Mr. Barrett. He said on cross-examination that he had no reason to doubt what the defense experts found with respect to organic brain damage and that, in fact, it would be intellectually dishonest. Intellectually dishonest for him to disagree with the findings of Dr. Myura and Dr. Young. So that evidence basically, and it's very powerful mitigating evidence, that evidence basically stands unrefuted. Well, counsel, on the brain damage and mental health evidence from Dr. Woods and Dr. Myura, did these experts say how those conditions influenced his criminal conduct in this case? Where's the linkage to what happened? Here's the linkage. The court, or the district court, made a big deal out of substantial planning and premeditation. Substantial planning. That was one of the aggravating circumstances found. And the district court said you don't connect any of this stuff up to that and it does not refute or diminish the evidence of substantial planning and preparation. That is simply not true because as our experts testified, and as we briefed this case over the last many, many years, we pointed out repeatedly that the mitigating quality of that evidence shows that contrary to this business about this being a planned attack on law enforcement, our mental health evidence shows that because of Mr. Barrett's condition, he reacted impulsively to the police raid. He was not able to accurately process. Well, counsel, let me let me just jump in and isn't it the case that Dr. Myura didn't know, wasn't briefed, or didn't have information about the specific offense, or didn't or at least didn't address the specific offense. Isn't that correct? She did not address it. However, Dr. Woods did. All right, let's go to Dr. Woods. What exactly did he say? I mean, he talked about these conditions may be affecting conduct in a pressured situation, but what did he say about this situation exactly? Where am I going to see that in his testimony? Because I've been looking for it. I think you're going to see it in the testimony. You're also going to see it in our brief, your honor, because it's the lawyer's job to synthesize all this for the fact-finder, and that's what Dr. Woods said. Okay, but did Dr. Woods address this causation issue, the linkage of the conditions with the criminal conduct? Yes, I believe in context, if you look at all of it, he did, your honor, and what I was getting at is Dr. Woods and our other experts testified that because of Mr. Barrett's condition, he's not able to accurately process what is going on in the moment, not able to inhibit his actions due to the skewed manner in which he perceives unfolding events, and all of this would have blunted the case for substantial planning and premeditation. It would also have blunted and totally disavowed or gotten rid of this notion from the district court that there was no connection, that we never connected it. First of all, to the extent the district court and the government are arguing that there's some kind of nexus requirement with our evidence, that has been ruled out by the Supreme Court in Kennard versus Dredge, but we did, under Mr. Barrett's condition, and what happened on the night of the raid, to show that due to his neurological problems, his well-known paranoia that was acknowledged even by Dr. Price, and all of those things in combination, this is somebody who is reacting inaccurately in the moment to what he perceived was going on. When you have a car that doesn't have any police lights, that's the lead vehicle run up on his property and literally run into his house, and then you have these following police cars. The first car almost hits Toby Barrett, Mr. Barrett's son, and Mr. Barrett reacts in the moment, and all of that neurological evidence and all of this mental health evidence is certainly relevant to all of that. So, another thing that needs to be brought up, I think, Your Honors, with respect to the organic brain damage question, is the district court's statement that Mr. Barrett was a malingerer, and to the extent that any of the neuropsychological tests showed that he had problems, it was because he was malingering. That is directly contrary to the entirety of the evidence that was presented at the evidentiary hearing, because the government's doctors stated that Mr. Barrett was not malingering, that he gave his best efforts. Our doctors said that Mr. Barrett was not malingering, he gave his best efforts. There's nothing in any records of any previous contacts he had with the mental health system that shows he was malingering in any fashion whatsoever. So, the district court's claim that these results from the neuropsychological testing are not reliable because of malingering is totally contradicted by the record evidence from the evidentiary hearing. The district court, along the same lines... Counsel? Yes, sir. Might be helpful to the panel if you could tell us how your case is different from the case this court decided in 2017 in Littlejohn, which also came to us after one of these evidentiary hearings. Why would we have a different result here from the result in that case? You'd have a different result because the aggravating circumstances in this case are much weaker than they were in the Littlejohn case, and the type of malady that Mr. Littlejohn suffered from was said to be something that he had not tried to deal with or anything else. Mr. Barrett had a lengthy history of prior contacts with the mental health system, and more specifically, the neurological evidence directly conflicts and meets the evidence of substantial planning and premeditation and places an entirely different light and context on Mr. Barrett's actions and what he perceived. So, in the context of this case and under the facts of this case, that evidence is specifically mitigating as to what went on, and that's another reason that it differed from Littlejohn, which I believe involved a preplanned robbery or something of that nature where somebody was killed. So, your honors, we think that, as this court has said numerous times, the evidence of organic brain damage is extremely significant mitigating evidence, and that's especially true in this case. I want to touch very briefly, because I see my time is running and I want to say some of it for rebuttal, on the psychiatric evidence of bipolar versus what Dr. Pitts said was nothing more than drugs, drugs, drugs. If you look at our briefs, your honor, and you look at the evidence, there was numerous corroborating evidence for the finding of bipolar, even though no previous mental health professional before Dr. Woods had made a final diagnosis of bipolar. There was a provisional diagnosis of bipolar. But there are numerous things that corroborate Dr. Woods and go against this drugs, drugs, drugs thing. One of them being that about 65% of people with bipolar disorder are also drug abusers or drug users. As Dr. Pitts said, that's a form of self-medication. Mr. Barrett was committed at one point for 28 days as a mentally ill person, not as somebody who suffered simply from drug use. But if you look at all that, there is significant corroboration for the finding of PTSD and bipolar, as opposed to what the evidence, all of it, including what was put up at the evidentiary hearing, shows that there would be at least one juror who, had they heard this evidence, would have given a different answer to death versus life, and in fact would have sentenced Mr. Barrett to life. This was not a strong case for the death penalty. The essence of this case was tried twice in state court, and they couldn't even get a first-degree murder conviction. They got a manslaughter conviction. Mr. Barrett had no previous felony convictions. The jury rejected death on counts one and two. They rejected the fact that he was a continuing danger. They rejected the hack aggravator. And Mr. Barrett's case, bottom line, compares extremely favorably to other cases in which the Supreme Court and this court had granted sentencing relief for a failure of effective assistance of counsel in the penalty phase. If there are no other questions, Your Honors, I would like to reserve what little time I have left for a vote. Okay. Mr. Kahn. Good morning, Your Honors, and may it please the court, Jeffrey Kahn on behalf of the United States. Your Honors, the district court in this case appropriately and correctly determined that trial counsel's omission of mental health and certain family history evidence did not prejudice Kenneth Barrett's penalty phase verdict. In fact, no reasonable probability exists that the omitted evidence would have led to a more favorable verdict. The evidence, however, can only be evaluated in light of the facts developed during the trial. And there are here three elemental facts that that counsel has touched on that I think bear underscoring here. The first is that this was unquestionably a substantially planned and premeditated murder. Excessively so, one might say. The second is this issue of premeditation. And it was clear that Mr. Barrett had been intending to confront the police violently should they enter his land, not for hours or minutes, but weeks and months. He'd made repeated statements and in different contexts to different people. He was clearly bent on doing exactly what he did should he get the opportunity. And in fact, just hours beforehand, commented to his cousin, Travis Crawford, after they saw the state troopers go by that if they returned later, all hell would break loose. I guess your position on that would be that, um, in light of that planning and his intention to confront law enforcement for these weeks and months, that any evidence of his disassociative syndrome or mental issues wouldn't have had any effect on the jury? Well, certainly not the mental health issues that were testified to by Dr. Woods and Dr. Maiora. They indicated that Mr. Barrett might have had some difficulty confronting issues under stress, making decisions under stress, switching between visual stimuli under stress. The truth is that first, Mr. Barrett had decided well ahead of time that he would do exactly what he did. He'd even run through a dress rehearsal that a witness named Randy Turman testified to. This was some weeks beforehand. Mr. Barrett was led to believe that the police were about to enter his land, and Randy Turman saw Mr. Barrett go and get his AR-15. So this was clearly what he had in mind. I mean, couldn't the expert testimony, though, say that even in light of that evidence, give the jury the ability to say, you know, he was he was talking about it. He was planning it. A rational person without these mental health issues, though, would have still maintained the ability to back away from out. But he, being someone who can't process things on the fly, was forced to stick with his plan and couldn't decide that it was a bad idea and that he should just give up. Well, I think there are two issues with that. First, neither expert was in a position to so testify. Dr. Maiora admitted during the evidentiary hearing that she was not in any way familiar with the case. Dr. Woods, from the outset of his participation in this case, has indicated both in his declarations and, frankly, in his testimony that he, too, had no real appreciation of what had occurred on Kenneth Barrett's land in 1999. Every indication is that he permitted himself to be misled by Mr. Barrett's, I presume Mr. Barrett's, statements that Mr. Barrett only fired on the police after they had first fired on him and wounded him. Nothing of the sort had occurred. Hadn't Dr. Woods reviewed the police report? Doesn't the record at least show that? Whether he had or he had not, the fact remains that he appears to have offered up his opinion based on something that simply didn't occur, which is that Mr. Barrett was reacting to some act of violence perpetrated on him by the police. And there have been subsequent attempts by Mr. Barrett to recast this case as involving him acting in self-defense. One of the fascinating details that gets lost in the trial transcript, I think, and is responsive to this notion that this was some out-of-control cowboy military style raid, Lieutenant Geringer, I believe, testified that in the previous 10 years that the state trooper team had been serving local arrest warrants, there had been not a single discharge of a weapon by the team. Hadn't happened. So the idea that they had entered Kenny Barrett's land guns a-blazing is just utterly unsupported here. And it could not be the basis for a valid opinion by either of the jurors to be, at best, what they believed. I don't think Dr. Mayor even had that familiarity with the record. Let me ask about the evidence of planning. Was that so overwhelming as to be indisputable? Or was that based on testimony by disreputable people and their testimony might be discounted by jurors who heard the mental health experts and would have decided, no, he's not capable of doing what these witnesses said he did? Well, all of those people were friends, associates, relations of Mr. Barrett. I Most, if not all, had histories of drug use. But I think there comes a point when a jury is confronted by six witnesses saying that they perceive more or less the same behavior and statements from one person, that it cross-corroborates. And it's particularly cross-corroborating when the defendant is keeping more or less at his side, an AR-15, with three magazines taped together in preparation for meeting the police. So, in essence, the evidence of substantial planning and premeditation was overwhelming. I might agree if there were one or two witnesses that the defense could have impeached, but not six. Not six with this level of preparation for this confrontation. And I'd like to bring that back to Judge Carson's question about whether or not the mental health professionals could have somehow meaningfully attacked this decision-making by Mr. Barrett. One of the issues, and we delve into this at some length in the brief with the mental health opinions, was that they promised far too much and delivered far too little. Mr. Barrett's performance just on the night in question was far better than what was predicted by the mental health professionals. He was capable of engaging a team of, I believe it was 11 police officers in a running gun battle. He waited until the first trooper car was beyond a point of easy egress. He opened fire. He was moving, apparently, to obtain cover and it's based on perceived threats. First firing at the lead car, then changing over to the first officer to leave the car, then changing over to the second officer to leave the car. There's not a man who was demonstrating any major inability to act under stress. But beyond that, when discussing Mr. Barrett more generally, it's clear that the testimony of these experts was not reliable. It did not describe the person that even Mr. Barrett would have to admit he was. I say, for instance... Let me back up a minute first. Were the experts' question about his conduct, Barrett's conduct at the time of the killing, and asked whether that was consistent with their view of his mental condition? Well, if recollection serves, Dr. Maiora simply stated that she wasn't familiar with the facts of the crime. But on close examination by the government. Well, you said, you know, the questioning could be, you said he was incapable of proper executive function in a moment of da-da-da, and go through things that Mr. Barrett did in response to the police approach. Were they asked about that? I just don't recall those questions, but I can't say definitively one way or the other, Your Honor. Okay. So your point is that just your assessment of what the experts say, in your assessment, what the experts say is inconsistent with his behavior, even on the night of the killing. The opinions about his ability, his performance were inconsistent with his behavior generally, and on the night of the crime. Okay. Thanks. Please continue. And I think one particularly apt example of that, and this is something that Mr. Autry touched on, there's a comment that the district court made in passing with respect to Mr. Barrett's apparent competence to stand trial. Dr. Woods insisted from the time he became involved with this case through to his testimony at the evidentiary hearing, that in his opinion, Mr. Barrett was incompetent. He could not rationally assist his attorneys. And yet his attorneys, Brett Smith in particular, testified that Mr. Barrett was among the most helpful criminal defendants with whom he had ever worked. You know, and similarly, outside the scope of the crime itself, Dr. Maiora testified about Mr. Barrett's deficits and planning, abstract reasoning and attention, but these would have been inconsistent with the testimony that was offered at the penalty phase as it was. He had witnesses who came to talk about his ability to work as an auto mechanic. One of them talked about him overhauling engines. It's hard to square someone who is capable of overhauling an engine with someone who has debilitating deficits in planning, abstract reasoning and attention. So was there someone at the evidentiary hearing that that linked everything that connected the dots and said, because of all of these mental deficiencies, he couldn't have known what he was doing that night or, you know, he wasn't able to deal with the situation like a rational person would have? I do not believe that there was any mental health professional, certainly from the defense that A, offered an opinion about the actual facts of the crime. I think the closest we came was we had diagnoses from the government experts of personality disorders, polysubstance abuse. These were things that were plainly impacting Mr. Barrett's performance and his behavior that night. But there there was no there was no disorder, no mental illness that was ever connected to his conduct or his decision making, as it was proven to the jury at the time of trial. Counsel. Did anyone, including the government experts other than Dr. Woods, conduct a complete psychiatric examination of Mr. Barrett together with a full battery of neuropsychological tests? Wasn't Mr. But didn't Dr. Wasn't Dr. Woods the only. The only expert who did that, my understanding is that Dr. Woods performed a psychiatric evaluation. I believe it was Dr. Young who had performed on behalf of the defense, a neuropsychiatric battery. Um. On the government side, Dr. Price had performed a neuropsychological workup. It was a less complete set of testing with regard to the question of brain damage because Dr. Price, among his tests, gave an exam I believe was referred to as the R bands. Um, which is, uh, not as in-depth a test and it did not demonstrate a deficit that required any further inquiry in his opinion. Um, again, that was substantially closer in time to the crime than any evaluation that was done by the defense in anticipation of this litigation. Um, and then separately, uh, the government retained Dr. Pitt, who performed his own separate psychiatric evaluation of the defendant. But I don't believe that there was any single professional who was in a position to perform both kinds of testing. And I might note in that regard, council made a statement about Dr. Pitt, uh, saying that it would be unethical for him to contradict the neuropsychological testing. My understanding of that was he was saying that was not his area of expertise, not that he necessarily concurred in the findings. What do you think about the evidence at the hearing about the abusive background and the dysfunctional background, um, and the way the district court disposed of that? Well, with regard to the question of how the court disposed of it, I, the government stands by its position that that procedural issue is not squarely before the court, but that said, we believe, and this is based on the district court's own statement in the opinion that it reconsidered all of the mitigating and found the, there was a lack of prejudice, but the court did in fact, as it said, it did consider the family history evidence. And I'd like to touch on a point that was made during the appellant's argument. Um, there, there was evidence enough that Mr. Barrett's upbringing was probably less than ideal as things stood at the end of the penalty phase. It was clear that his parents had divorced and that he had moved frequently. Um, that after the divorce, he had had infrequent contact with his father. Received beatings. Pardon? Received beatings. I'm not certain that the received beatings was made clear, uh, at trial. I don't recall. Um, but there were more clear indications that things were less than ideal. Uh, his mother's testimony about his departure from high school was, uh, especially in Sosen, I thought, given that if he left at 16, apparently over an argument with someone over a haircut, um, and left in the ninth grade, uh, clearly for most jurors, I, I think that would have been some indication that his family life was in some meaningful way, uh, amiss. Right. True, true. But let's go to the evidentiary hearing. I mean, at the evidentiary hearing, he produced more extensive evidence of this dysfunctional family background and his, um, abusive family background than the jurors ever heard. There is more extensive evidence, but I think there's, it is a mistake to conclude that this evidence is purely additive. It is in fact, not purely additive. It would have altered the overall calculus of this case. And one of the things that is of distinct importance in this case were, uh, trial counsels, evident and frankly successful efforts to blunt the government's allegations of future dangerousness. And, uh, rife in the testimony that they took during the course of the, the trial itself were their efforts time and again to try and minimize Mr. Barrett's innate dangerousness. So with that as a background, the, the further evidence that is adduced during the evidentiary hearing also brings up yet more evidence of the defendant's drug use and to the extent that that there was certainly testimony about that during the original trial, the family witnesses for the most part denied any real knowledge of what Mr. Barrett's drug use was like. Um, there was a, uh, concession by Mr. Barrett's cousin that, uh, he, he, or rather his uncle, that he lived a chaotic life and, uh, most substantially of all, there was an acknowledgement of real and substantial violence, not only between Mr. Barrett and his brother, but between Mr. Barrett and his mother. And this is significant in light of Jalene Dodson's repeated denials during the course of her testimony at trial that the two of them had engaged in physical violence. And when one begins to add that evident contradiction with Stephen Barrett's testimony that Mr. Barrett had once sent him to the hospital for stitches and another time left him with a need or not with a need, but rather with a scar that, that was with him for the course of his life, it becomes a lot more difficult to avoid the impact on this future dangerousness allegation. You said that the, the reason for downplaying the violence and perhaps, um, talking up what the, uh, opposing counsel referred to as the good guy evidence, um, you said that the purpose of that was to prevent a finding of future dangerousness to try to minimize his future dangerousness in the eyes of the jury. Um, that worked, did it not? It worked. It worked so well that, uh, two jurors actually returned a mitigator, uh, finding that Mr. Barrett was not a future danger. So, so when, when counsel says that never works, uh, I'm curious, I would, I would think it wouldn't work very much, but can you, do you have a different experience from defense counsel on the success of the good guy, uh, mitigation arguments? I can't speak in general terms or certainly in statistical terms to what will and will not work. I think that the defense correctly perceived in this case that future dangerousness was a substantial and, uh, dangerous allegation for them. I was unlikely given this evidence that they were going to escape, uh, two of the statutory aggravators, those being substantial planning and premeditation, and then, uh, either grave risk to others or, or multiple murders. I mean, those, those things were clearly going to be proven, but, uh, to, to us, uh, that here, here's a place where we can win the day. Um, And the mother testified contrary to the new evidence of the awful childhood. Is that, is that correct? Pardon? He did. I'm sorry. The mother. Yes. Oh, I thought you said he did. Okay. Yeah. Okay. Okay. Counselor, in your view, did the government present, um, any additional evidence at the evidentiary hearing, um, in support of aggravation? No, Your Honor. Um, I, there was certainly no effort to gild the lily with, with regard to the crime, um, but as I've indicated, some of the evidence that did come out during the course of the hearing actually does tend to underscore the government's position with regard to future dangerousness. And I, before I lose the opportunity here, as my, my time is winding down, I putting aside the government's many disputes with the reliability of that, that evidence. Had, had Mr. Barrett put in, into issue his mental health, there's seems unquestioned that it would have resulted in the, the, the introduction of the, the evidence of the, the crime that he has witnessed. Um, and in fact, Mr. Autry touches, uh, on, on one of those occasions, Mr. Barrett's, uh, time at Eastern State Hospital. I do want to correct the impression that Mr. Barrett spent 28 days at Eastern State Hospital. Mr. Barrett received a, a commitment for up to 28 days at Eastern State Hospital. But Mr. Barrett was treated at Eastern State Hospital for eight days. Um, and what's more, the records regarding his treatment at Eastern State Hospital make clear that he was diagnosed on exit with mixed substance abuse, uh, uh, and, and marital problems, uh, and, and a mixed personality disorder. Um, that's significant for two reasons. One, it blunts Dr. Wood's, uh, repeated statements that the historical evidence in some way indicated that the time at Eastern State supported his diagnosis of bipolar disorder. It did not. The psychiatrist who saw him there did not think that he had bipolar disorder. Um, and more is the point on admission, the records of Mr. Barrett's time at Eastern State Hospital indicate that he was there because his wife brought him to the emergency room complaining about his threats to her and his acts of violence toward her and his sexual assault of her and his kidnapping of their shared child, uh, his burning of their property. So the, not only was the, the, the family history evidence going to be at best a mixed bag, but the mental health evidence when one delved into it was going to completely undercut the defense's efforts to try and cast Mr. Barrett as some benign figure who made a mistake in the middle of the night when he saw the police. Uh, counsel, let me just, uh, I've, I've been interested, uh, that you've mentioned, uh, reliability of the defense, uh, experts. Um, did, did the government, uh, challenge, uh, at all their qualifications to present, uh, these opinions at the evidentiary hearing? No, the government did not. I, Dr. Woods is a licensed psychiatrist. Um, and Dr. Maiora and Dr. Young, I believe also had reasonable credentials. We just believe that their diagnoses in this case are wrong. Um, they, they, they erred. Um, and I take this opportunity to point out that what Mr. Autry casts as a decision about credibility is not, there, there was not a decision made by the district court here that required the district court judge to revisit this evidence with the, with the witnesses live. Uh, he made absolutely no indication that is the district court judge made no indication at all that he disbelieved, uh, these people. Uh, I, I certainly thought that they were sincere in their findings. They were just, again, incorrect. And because they were incorrect, they were not persuasive. I, based on the evidence before this court, there is no reasonable likelihood that even one juror would have voted for a verdict less than death in this case, unless the court has any further questions. I'd like to follow up. You, you were saying some things about the, uh, the, the family problems and the mental health problems that suggested the evidence that defendant now wants to pursue, wants to put on, would have been inconsistent with the, uh, strategy regarding future dangerousness. That to me suggests that there's an argument that it was not ineffective assistance to not put on that evidence. I assume that the reason you're having to refer to that in terms of prejudice rather than ineffective assistance is because defense counsel didn't pursue this evidence for trial or at trial. And we do not say that, uh, counsel is, is effective when counsel didn't do the, didn't do his homework, didn't look into things. Would, would you respond to this? Was, was there, um, was there an informed decision with regard to mental health or family background based on the strategy of presenting him as someone who didn't, uh, create a future risk of danger? Certainly with regard to the diagnoses that were offered, um, the government has no argument that, that the, neither Mr. Hilfiger nor Mr. Smith were in possession of, of these findings. Um, the. Well, it's not, I don't think that's necessary, but they hadn't pursued mental health experts really. Well, as the district court found the decision not to pursue mental health evidence was apparently made before they consulted with, uh, Dr. Oh, I'm sorry, Jeannie Russell. Um, regarding her findings. And she had actually previously evaluated Mr. Barrett and found that he did not suffer from any major mental illnesses. But, uh, given the district court concluded that they had previously made the decision, as you say, uh, it's, it's an impossible position. What about on the family? What about on the family background? Was there an informed decision made there? I think that's less clear, Your Honor. Um, there, there's no doubt that there were a lot of investigative, uh, records available to counsel. Counsel had some interaction with the family. The family disputes, uh, now the extent of that interaction. And of course they had access to the defendant. I think the overall arc of the evidentiary hearing was that it's really hard to remember that from all that time ago. Um, so it's hard to say definitively how much of this they knew. Um, and shot through all of that is the clear indication that Mr. Barrett was guarded in the extent to which he wanted to bring his family into this dispute to the extent that during the penalty phase, he demanded to be removed from the court. Thank you. Your time's expired. Do any other member of the panel have a question? If you'll indulge me for one moment, um, did either Mr. Smith or Mr. Hilfiger testify about their strategy of pursuing the he's not a future danger defense or mitigation? I don't believe so, but I, I, I'd be calling myself a liar to say that I remember perfectly. Okay. Thanks. Thank you. Okay. Mr. Autry, how much time does he have left from before two minutes? Uh, let's make it five minutes anyway. Thank you. Thank you. I would point out first, may it please the court. I would point out first that Dr. Health expert, she did not do a comprehensive mental health evaluation of Mr. Barrett. She was going to testify if she was going to testify at all with respect to a risk assessment and they didn't put her on the stand. Uh, your honors, there was no informed decision either as to the mental health evidence or the family background evidence. Uh, a very superficial investigation, if you could call it, that was done and the reason it's clear that there was no informed decision is the fact that the government has conceded that trial counsel was constitutionally deficient in preparing a mitigation case for trial. Uh, I would also, uh, contest what Mr. Khan said about how Mr. Barrett's past contacts with the mental health system undercut what Dr. Woods had to say to the contrary. As Dr. Woods testified, Mr. Barrett's past mental health records indicated that yes, while he did have a drug problem and he was treated for a drug problem, he had underlying mental conditions that led them at one point to prescribe psychotropic drugs to at one point provisionally diagnosed with bipolar and then to diagnose him with organic affective disorder. So none of that blunts Dr. Woods and in fact supports him. And Dr. Woods explained that in his testimony. Uh, Mr. Barrett's mother did not testify at trial contrary to what she said later on in her declaration. She was never asked and it was never investigated whether she and her husband were abusive to Mr. Barrett. They were allowed to put on a bunch of evidence about Mr. Barrett being a drug user and abusive to his ex-wife and didn't get along with his mother. But the flip side of that with respect to his abusive background and upbringing was never brought in front of the jury because it was never investigated. And an answer to Judge Hart's question about the good old boy defense having worked. Well, actually it didn't work because Mr. Barrett got the death penalty on count three. Had it worked, we wouldn't be here. Because it didn't work and they didn't do the job that they should have done and didn't find the evidence that they should have found. That's the only reason we're here. Uh, as far as. There's work and there's not working. It worked with respect to the aggravating circumstances of future dangerousness, which, uh, I mean, he didn't get the death penalty on the first two counts. That's correct. And that's one of the reasons prejudice is so apparent because this was not a strong case for the death penalty and the evidence that was left off would not have made Mr. Barrett appear to be the continuing threat that the jury found he was not. This is somebody who had no prior felony convictions of any kind whatsoever. The jury did not find continuing threat. They would not have found it under the evidence we presented because it's not in conflict with what was presented or what little was presented to the jury. Um, it's indicated by the government that Dr. Price's analysis, which was just a screening test for neurological impairments, not a whole complete battery, was done closer in time to the events. Dr. Woods and Dr. Young, who examined Mr. Barrett in 2009, related their findings back to Mr. Barrett's mental health and neurological deficits at the time of the offense. And in answer to the question, did anyone other than Dr Woods conduct a complete analysis, psychiatrically and otherwise? The answer is no. Dr. Woods was the first doctor to perform a comprehensive psychiatric evaluation of in conjunction with and working with Dr. Young, who did the neuropsychological evaluation back in 2009. With respect to this deal about how Mr. Barrett being a good mechanic obviates all this, as Dr. Woods pointed out, his ability to work on cars is governed by a different area of the brain than the area of the brain from which Mr. Barrett suffered brain damage. And with respect to the overwhelming evidence of a substantial planning and premeditation, as Judge Hart said, they rejected the death penalty on one and two. We've explained why that evidence was not very credible, not credible at all. Numerous of those witnesses have now recanted. The district court should be reversed in a new sentence and trial order. And unless there's any further questions, I see my time has expired. Thank you, counsel. Thank you, Your Honor. Case is submitted. Counsel are excused.